WINDHAM FIRST TAXING DISTRICT *v.*
TOWN OF WINDHAM
(13337)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and HULL, Js.

*(One justice dissenting)*

Argued May 10—decision released August 9, 1988

*M. Hatcher Norris,* for the appellant (plaintiff).

*John D. Boland,* for the appellee (defendant).

HULL, J. This case involves a turf war between the Windham First Taxing District (district) and the consolidated town of Windham (town). The dispositive issue is whether the district's furnishing of street lighting in the district, in accordance with a provision of its charter, preempts the field so that the town cannot tax the district residents for such services. We agree with the trial court that a special service tax district, organized under chapter 105 of the General Statutes, cannot prevent a town from providing and taxing for such services, if the town is so authorized by its charter or the General Statutes. We, therefore, find no error.

The district brought a declaratory judgment action against the town to determine whether the town's taxation of residents of the district for services paid for and provided by it "violates the rights of the members of the Windham First Taxing District to be free of taxation without representation, to not be deprived of property without due process of law, and to not be subjected to dual taxation." The district also sought an injunction against the town restraining it from taxing the residents of the district for services provided and paid for by the district. The town's third special defense, pertinent to this appeal, claimed that the district "was not created to usurp but merely to supplement and enhance the Town's authority to provide the

specific services." The district amended its prayer for relief claiming a declaratory judgment determining: (1) whether the town has the power to tax the residents of the district for street lights; (2) whether the taxation by the town of the residents of the district for services not supplied nor paid for by the town constitutes the deprivation of property without due process of law; and (3) whether the taxation by the town of the residents of the district for services supplied by, paid for and taxed by the district constitutes impermissible dual taxation.

From the joint stipulation of the parties and accompanying exhibits the court made the following finding of facts. The plaintiff district is a municipal corporation that was organized by vote on April 14, 1981, pursuant to chapter 105 of the General Statutes and has continued to exist since that date. Pursuant to its charter and by-laws, the district was originally created as a fire district "for the purpose of providing fire protection and certain emergency services normally attendant to fire protection facilities." The district constitutes a separate taxing district within the boundaries of the defendant town and is subject to those limitations specified in the General Statutes with respect to chapter 105 corporations. It is a statutory special service district encompassing a geographical area coextensive with the areas outside the former boundaries of the city of Willimantic. The district's charter provides that the district shall be established for the purpose of lighting streets, in addition to the purpose of providing fire protection.

The defendant town is a Connecticut municipality that has existed since 1692, and that, pursuant to the Home Rule Act and vote of December 15, 1982, was consolidated with the former city of Willimantic. The town has been governed since July 1, 1983, pursuant to a consolidation charter. The consolidation charter

creates within the town two special service districts, the "Windham Service District" encompassing the area outside the boundaries of the former city of Willimantic and coextensive with the area encompassing the plaintiff district, and the "Willimantic Service District" consisting of the area within the boundaries of the former city of Willimantic. The plaintiff district was never consolidated with the town pursuant to the Home Rule Act although provision for consolidation of such a district is found in General Statutes § 7-194.

The consolidation town charter allocates responsibility for providing fire and police protection services within their respective boundaries to each of the service districts. That charter further provides that the "town of Windham shall have all the powers previously granted to the town of Windham and the city of Willimantic, and all additional powers conferred upon municipalities by the Connecticut General Statutes . . . ."

Pursuant to its charter and the General Statutes, the district taxes its residents for services that it provides to them within the district. The district allocates a portion of its budget for street lighting and pays the provider, Connecticut Light and Power (CL&P), for the cost of street lighting incurred by the district within its territorial boundaries.

Under the consolidation charter and the General Statutes, the town taxes the residents in the geographical area comprising the town, including the geographical area of the district. The town budgets monies for street lighting throughout the town. It actually pays for the cost of street lighting only in the geographical area comprising the boundaries of the former city of Willimantic, which excludes the geographical area of the district. The town has a budget surplus with respect to street lighting throughout the town that is roughly equal to the district's expenditures for street lighting

within the district from year to year. The town is willing to pay for the cost of street lighting incurred by the plaintiff within the district.

The court made the following factual findings and legal conclusions: (1) while the district taxpayers were being charged for street lighting by both the district and the town, this effectively higher tax rate was not caused by the town, but by the district itself; (2) the town was willing to pay for the district's street lighting but the district has refused to allow it to do so; (3) before the district was created on April 14, 1981, and the town was consolidated with the city of Willimantic, the geographical area comprising the district was controlled by the town; (4) before the district was created the town had the primary responsibility to provide street lighting services to the residents in the district area; (5) this power rested in the town by the terms of the consolidation ordinance which provided that the consolidated town "shall have all the powers previously granted to the Town of Windham and the City of Willimantic, and all additional powers conferred upon municipalities by the Connecticut General Statutes, as amended from time to time"; (6) the primary responsibility for providing street lighting to the residents of the district lies with the consolidated town; and (7) the town is granted, under General Statutes § 7-148 (c) (4) (F), the power to provide for lighting the streets, highways and other public places of the municipality and for the care and preservation of public lamps, lamp posts and fixtures.

The court concluded that the result of a holding that the town had no power to tax the district residents for street lights would be "potential anarchy" in that a neighborhood could segregate itself from the rest of the town and decide that it wanted separate police protection and fire protection to the exclusion of the town providing such services. Such a result, it posited, would

require an abdication by the town of its responsibility to provide essential services to town residents. The court stated that a special service district may provide greater service than the municipality is providing but cannot exclude a town from providing a specific service in the district where the town specifically has this power by virtue of its charter and the General Statutes. The court concluded that the town had the power to tax the residents for street lighting. The court lastly found no due process violation nor impermissible dual taxation under the circumstances.

The plaintiff district has appealed from the judgment for the defendant, claiming that the court erred in: (1) concluding that the town has the power to tax the residents of the district for street lighting when the taxation and provision of such services is otherwise provided for in the duly organized taxing district; and (2) concluding that the taxation by the town of the residents of the district for services not supplied nor paid for by the town does not constitute the deprivation of property without due process of law. We find no error.

The district's first argument comes down to its claim of preemption of the right to provide street lighting after the district was organized under General Statutes § 7-325.[1] It bases its right to do so on the district's

---

[1] General Statutes § 7-325 provides in pertinent part: "ORGANIZATION. BOUNDARY CHANGES. ANNUAL REPORT. (a) Upon the petition of twenty or more voters, as defined by section 7-6, of any town, not residing within the territorial limits of any city or borough in such town, specifying the limits of a proposed district for any or all of the purposes set forth in section 7-326, and not including within such limits any part of any city or borough in such town, the selectmen of such town shall call a meeting of the voters residing within such specified limits to act upon such petition, which meeting shall be held at such place within such town and such hour as the selectmen designate, within thirty days after such petition has been received by such selectmen. . . . Upon approval of such petition by two-thirds of the voters present at such meeting, the voters may name the district and, upon the vote of a majority of such voters, choose necessary officers therefor to hold office until the first annual meeting thereof; and the district shall

purpose, "to light streets," described in General Statutes § 7-326.[2]

The district argues that its power to light streets may be terminated only by consolidation of the district with another unit of government pursuant to General Statutes § 7-195 or by termination of the district pursuant to General Statutes § 7-329. This argument sidesteps the town's position. The town does not claim that the district lacks any of its statutory powers.[3] The only issue is whether, when the town is willing and able to

thereupon be a body corporate and politic and have the powers, not inconsistent with the general statutes, in relation to the objects for which it was established, that are necessary for the accomplishment of such objects, including the power to lay and collect taxes."

[2] "[General Statutes] Sec. 7-326. PURPOSES. At such meeting, the voters may establish a district for any or all of the following purposes: To extinguish fires, to light streets, to plant and care for shade and ornamental trees, to construct and maintain roads, sidewalks, crosswalks, drains and sewers, to appoint and employ watchmen or police officers, to acquire, construct, maintain and regulate the use of recreational facilities, to plan, lay out, acquire, construct, reconstruct, repair, maintain, supervise and manage a flood or erosion control system, to plan, lay out, acquire, construct, maintain, operate and regulate the use of a community water system, to collect garbage, ashes and all other refuse matter in any portion of such district and provide for the disposal of such matter, to establish a zoning commission and a zoning board of appeals or a planning commission, or both, by adoption of chapter 124 or chapter 126, excluding sections 8-29 and 8-30, or both chapters, as the case may be, which commissions or board shall be dissolved upon adoption by the town of subdivision or zoning regulations by the town planning or zoning commission; and to adopt building regulations, which regulations shall be superseded upon adoption by the town of building regulations. Any district may contract with a town, city, borough or other district for carrying out any of the purposes for which such district was established."

[3] A joint stipulation of the parties dated August 12, 1986, states: "The Windham First Taxing District Charter provides that the District shall be established for the following purposes, in addition to that of providing fire protection:

"(a) to light streets;

"(b) to appoint or employ watchmen or police officers;

"(c) to construct, regulate and maintain the use of recreational facilities;

"(d) to establish a public library and to provide and maintain such suitable rooms or buildings as may be necessary for such library."

provide a certain service, the district may provide and tax for that same service and claim that the town cannot legally tax the district residents for such service. The parties do not claim that the district is presently exercising any of its powers other than lighting streets.

The district claims that the last sentence of § 7-326 supports its position. We conclude, however, that the provision that "[a]ny district may contract with a town, city, borough or other district for carrying out any of the purposes for which such district was established" is a catchall general power that sheds no light on the issue in this case.

The district further relies on the provision in § 7-326 that any zoning and planning commission or board created under that section shall be dissolved upon adoption by the town of competing regulations, and that any building regulations, similarly adopted pursuant to that section, shall be superseded upon adoption by the town of such regulations. The district claims that these specific exclusions of district powers evince a legislative intent that other district powers preclude town powers over the same subject. We are unpersuaded. The extinguishment of the district's powers under § 7-326 occurs in the event that the town adopts similar regulations *after* the districts have entered the field. In such a situation, conflict between competing powers never comes into being. This specific statutory scheme has no bearing on the situation in this case, where the town had the power to provide street lights in the district's area before the district was created.

The district relies principally on two Connecticut cases. *Watertown* v. *Watertown Fire District,* 28 Conn. Sup. 413, 265 A.2d 496 (1968), was a declaratory judgment action concerning the extent to which the town, having enacted a charter under the Home Rule Act,

was subject to powers conferred upon two defendant fire districts by a series of special acts of the legislature. That case also involved a conflict subsequent to the adoption of a town charter under the Home Rule Act. In a series of rulings concerning various aspects of overlapping authority contained in the charter and the special acts, the court ruled that the town could not claim certain powers that the districts were exercising, when those powers had been specially granted to the districts by special act. The town points out that the court relied specifically on the rule that a special act is not affected by a general statute unless the intent to repeal or alter is clearly manifest. Id., 419, 421. *Watertown* is clearly inapposite to this case where a district created by a special act is not involved.

The district stresses *Watertown's* dictum that "[t]he plaintiff is obviously seeking a consolidation of the [defendant districts] with itself . . . ." Id., 421. The district argues that, like the *Watertown* case, this case involves a "thinly veiled attempt at consolidation without compliance with statutory requirements." In *Watertown,* the court concluded that General Statutes §§ 7-195 through 7-201 govern any attempt at consolidation of the districts with the town. We do not disagree with this conclusion. We do not perceive, however, in this case any attempt by the town to achieve a "backdoor" consolidation with the district. The furnishing of fire and police protection services, among the principal objects of most local governments, was addressed in the consolidation charter by the creation of the Windham Service District and the Willimantic Service District. The town's action to furnish street lighting in the district appears to have two principal purposes: (1) to tidy up loose ends arising out of the concept and reality of consolidation; and (2) to establish the town's role, in general, as the primary provider of public services in the consolidated town. We note that, in keep-

ing with our analysis of the extent of the district's power to provide street lighting, this power may be utilized to supplement the lighting provided by the town. Further, the other powers of the district, not now being used, may also serve their original purposes. Only time will tell whether this decision will cause the euthanasia of the district.

The district relies most heavily on the case of *Pepin* v. *Danbury,* 171 Conn. 74, 368 A.2d 88 (1976). In *Pepin,* the plaintiffs, who were residents and taxpayers of Danbury, sought a declaratory judgment to determine the validity of a tax formula contained in the charter of the consolidated city and town of Danbury.[4] The consolidation ordinance established three tax districts. All property was included in the Basic Tax District, from which 85 percent of local tax revenue was collected. Those properties connected to either city water or sewer facilities were placed in Urban Tax District No. 1 and further taxed a sum equal to 7.5 percent of the total city revenues. Those properties connected to both city water and sewer facilities were included in Urban Tax District No. 2 and assessed an additional 7.5 percent of city revenue. Id., 76. The court found that those taxpayers connected to one service were assessed a rate 16 percent higher than those not so connected, and those with both services were assessed 40 percent higher than those taxpayers with neither service. Id., 78. On the defendant's appeal from the court's judgment that these differential tax rates were invalid, we concurred with the court's conclusion that the defendant acted in excess of its statutory authority when it charged the taxpayers of the two additional districts an amount in excess of "the cost of furnishing such service" pursuant to General Statutes § 7-198. Id., 88. The town argues that *Pepin* is inapposite to this case since

---

[4] Each consolidated city and town, although it may use the title and status of city, also remains one of Connecticut's 169 towns.

the town budgets for lighting at the actual cost thereof. Taxpayers of the district were not taxed at a different rate for lighting services than were other taxpayers in the town.

We agree with the trial court's reasoning that *Pepin* does not support the district's position. The court emphasized that there was one basic tax rate being used with respect to street lighting for all taxpayers of the town. And, as previously noted, the court concluded that, unlike *Pepin,* the higher tax rate charged to taxpayers in the district was caused by the district itself.

We come, then, to the underlying question of the relationship between the Home Rule Act[5] and chapter 105,[6] and the resulting claimed inconsistency between them because of overlapping powers. The court must use common sense in construing statutes and must assume that a reasonable and rational result was intended by the promulgating legislature. *State* v. *Campbell,* 180 Conn. 557, 564, 429 A.2d 960 (1980). If a court can by any fair interpretation find a reasonable field of operation for two allegedly inconsistent statutes, without destroying or preventing their evident meaning and intent, it is the duty of the court to do so. *Knights of Columbus Council* v. *Mulcahy,* 154 Conn. 583, 590, 227 A.2d 413 (1967); *Shanley* v. *Jankura,* 144 Conn. 694, 702, 137 A.2d 536 (1957). In addition, " 'when two statutes relate to the same subject matter every effort should be made to find a reasonable field for the operation of both statutes. . . [and] where there is a reasonable field of operation for each statute which does not impinge on the domain of the other, it is the court's duty to give them concurrent effect.' " *In re Juvenile*

---

[5] Enacted substantially in its present form in Public Acts 1957, No. 465, the Home Rule Act is now contained in chapter 99, General Statutes §§ 7-187 through 7-201.

[6] Chapter 105, entitled "Fire, Sewer and Other Districts," is now contained in General Statutes §§ 7-324 through 7-339*l.*

*Appeal (85–BC),* 195 Conn. 344, 365, 488 A.2d 790 (1985). The legislature is presumed to be aware and to have knowledge of all existing statutes and the effect which its own action or nonaction may have on them. *Miller* v. *Eighth Utilities District,* 179 Conn. 589, 593–94, 427 A.2d 425 (1980).

Neither party has cited any case or other authority concerning the principal issue in this case, nor have we discovered any directly on point. We will, therefore, look to the fundamental purposes of the Home Rule Act and chapter 105 and to the historical matrix of local governmental functions in Connecticut that gave rise to these statutes. The extensive legislative history of the basic Home Rule Act, Public Acts 1957, No. 695, furnishes no guidance since it was not concerned with the relationship between municipalities and chapter 105 districts but rather with the reconciliation of the state's power of governance through the general assembly with certain historically claimed local rights of self-government.[7]

This court has defined the general purpose of the act. "The purpose . . . of Connecticut's Home Rule Act is clearly twofold: to relieve the General Assembly of the burdensome task of handling and enacting special legislation of local municipal concern and to enable a municipality to draft and adopt a home rule charter or ordinance which shall constitute the organic law of the city, superseding its existing charter and any inconsistent special acts. General Statutes § 7-188; *Sloane* v. *Waterbury,* 150 Conn. 24, 26–27, 183 A.2d 839 (1962); *State ex rel. Sloane* v. *Reidy,* 152 Conn. 419, 209 A.2d 674 (1965); *Shalvoy* v. *Curran,* 393 F.2d 55, 59 (2d Cir. 1968); see Littlefield, 'Municipal Home Rule—

---

[7] The legal and historical background of the Home Rule Act is exhaustively analyzed in J. Griffiths, "Connecticut Home Rule: The Judicial Resolution of State and Local Conflicts," 4 U. Bridgeport L. Rev. 177 (1983).

Connecticut's Mature Approach,' 37 Conn. B.J. 390, 402 (1963); 56 Am. Jur. 2d, Municipal Corporations § 126; 62 C.J.S., Municipal Corporations § 124. The rationale of the act, simply stated, is that issues of local concern are most logically answered locally, pursuant to a home rule charter, exclusive of the provisions of the General Statutes." *Caulfield* v. *Noble,* 178 Conn. 81, 85–86, 420 A.2d 1160 (1979).

Special tax districts had their genesis in 1893 in "An Act relating to Organization of Districts for Extinguishing Fires and other Purposes."[8] Public Acts 1893, c. LVII. The rationale behind the creation of such districts fairly leaps off of the page of the statutes: to provide for specialized services in outlying areas of a town not contained within the territorial limits of any city or borough within such town. This provision, excluding such organized units of local government from the coverage of a tax district, has been in all the tax district statutes since 1893, despite frequent changes through the years expanding the powers and scope of

---

[8] Public Acts 1893, chapter LVII, provides in pertinent part: "An Act relating to Organization of Districts for Extinguishing Fires and other Purposes. . . .

"SECTION 1. Upon the petition of ten or more legal votes of any town in this state not residing within the territorial limits of any city or borough in said town, specifying the limits of a proposed district to be organized under this act, and not including within said limits any part of any city or borough in said town, the selectmen of said town shall call a meeting of the legal voters residing within said specified limits, to act upon said petition . . . .

"SEC. 2. At such meeting the legal voters may establish the district for any or all of the following purposes, viz.: to extinguish fires, to sprinkle streets, to light streets, to plant and care for shade and ornamental trees; to construct and maintain sidewalks, crosswalks, drains, and sewers; to appoint and employ watchmen or police officers. They may give a name to the district and choose necessary officers therefor, to hold office until the first annual meeting thereof; and the district shall thereupon be a body corporate and politic, and have all the powers in relation to the objects for which it was established that are necessary for the accomplishment of said objects, including the power to lay and collect taxes."

a district's authority.[9] From the inception of such districts their purpose has been supplemental and secondary to the jurisdiction and services of the primary local government. If the local government was a town only, such a district could be located anywhere in the town. But, if there was a city or borough in the town, a district's jurisdiction could not overlap such unit's service area.

No statute in Connecticut has ever authorized general governmental powers for districts. An examination of the controlling statutes shows that a district's powers are very carefully circumscribed so as to include only those powers necessary to carry out the special service involved in any particular district. We note further that chapter 105 includes no provision that the authorized powers to provide services included therein are exclusive so as to deprive the municipality of its right to provide such services.

Looking at the issue broadly, we conclude that the primary responsibility for overall local government lies with the municipality. "The town charter, whether adopted by special act of the General Assembly or, as in this case, under the Home Rule Act; General Statutes § 7-188; constitutes the organic law of the municipality. *Caulfield* v. *Noble,* [supra, 81]; *Bredice* v. *Norwalk,* 152 Conn. 287, 292, 206 A.2d 433 (1964). 'It is well established that a [town's] charter is the fountainhead of municipal powers. *State ex rel. Raslavsky* v. *Bonvouloir,* 167 Conn. 357, 362, 355 A.2d 275 (1974).' " *West Hartford Taxpayers Assn., Inc.* v. *Streeter,* 190 Conn. 736, 742, 462 A.2d 379 (1983). As a matter of public policy the district has adduced no good reason why the primary unit of local government

---

[9] General Statutes § 7-326 includes almost verbatim the first five broad categories of powers granted to districts by Public Acts 1893, chapter LVII. The only omission from the original powers listed is the power "to sprinkle streets," a reminder of a bygone era of dirt roads.

should not continue to have the power to provide for an existing street light system. Additionally, we conclude that to allow chapter 105 districts to decide which separate and competing services they wish to provide and tax for to the exclusion of town-provided services, may tend to foster the balkanization of local municipal government which the Home Rule Act and chapter 105, when read together harmoniously, were designed to avoid.

We conclude, therefore, that special tax districts are authorized to supply services where lacking, or to augment them when they are already provided by the municipality, but cannot displace or preempt the town's primary authorized power to provide and tax for such services.

The district's second issue on appeal is subsumed in the first. The district claims that the town's taxing of the district residents for services not supplied or paid for by the town constitutes a taking of property without due process of law in violation of article first, § 8, of the Connecticut constitution and § 1 of the fourteenth amendment to the United States constitution. The common meaning attributed to those due process provisions allow for these questions to be treated as one. *Roundhouse Construction Corporation* v. *Telesco Masons Supplies Co.,* 168 Conn. 371, 374, 362 A.2d 778 (1975), vacated, 423 U.S. 809, 96 S. Ct. 20, 46 L. Ed. 2d 29 (1975), on remand, 170 Conn. 155, 365 A.2d 393, cert. denied, 429 U.S. 889, 97 S. Ct. 246, 50 L. Ed. 2d 172 (1976).

The district's argument falls of its own weight. Since we have concluded that the town has the power to provide these services, it necessarily follows that it is the district that is causing any enhanced tax burden to the district residents. The due process clause applies to a taxing statute " 'only if the act be so arbitrary as to

compel the conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property.' " *Miller* v. *Heffernan,* 173 Conn. 506, 516–17, 378 A.2d 572 (1977), appeal dismissed, 434 U.S. 1057, 98 S. Ct. 1226, 55 L. Ed. 2d 758 (1978), quoting *A. Magnano Co.* v. *Hamilton,* 292 U.S. 40, 44, 54 S. Ct. 599, 78 L. Ed. 1109 (1934). Further, the due process clause does not require that the tax being levied be directly related to the specific benefits received by the taxpayer. *Miller* v. *Heffernan,* supra, 517.

" '[T]he system of taxation has not yet been devised which will return precisely the same measure of benefit to each taxpayer or class of taxpayers, in proportion to payment made . . . .' " Id., quoting *Dane* v. *Jackson,* 256 U.S. 589, 598–99, 41 S. Ct. 566, 65 L. Ed. 1107 (1921). The due process clause is violated only if the tax imposed constitutes a " 'flagrant and palpable inequality between the burden imposed and the benefit received . . . .' " *Miller* v. *Heffernan,* supra, quoting *Dane* v. *Jackson,* supra.

The town has consistently offered to provide and pay for street lighting in the district and has specifically budgeted funds for such purposes. Under the circumstances of this case there is not only no flagrant and palpable inequity on the town's part—there is no inequity whatsoever.

There is no error.

In this opinion PETERS, C. J., SHEA and CALLAHAN, Js., concurred.

ARTHUR H. HEALEY, J., dissenting. I respectfully dissent. I cannot agree, given the facts in this case, with the majority's basic conclusion "that special tax districts [here the Windham First Taxing District (dis-

trict)] are authorized to supply services where lacking, or to augment them when they are all already provided by the municipality [here the consolidated town of Windham (town)], but are not to displace or preempt the town's primary authorized power to provide and tax for such services." With that disagreement, I need not go on to discuss the due process issue raised by the district.

There is no serious problem with the facts; it is with the legal conclusions of the trial court that the majority endorses that troubles me. No one appears to question the fact that both the town and the district are essentially creatures of statutes and have only those powers given to them, expressly or impliedly by statute, to accomplish the object of their statutory existence. See, e.g., *State ex rel. Brush* v. *Sixth Taxing District,* 104 Conn. 192, 198, 132 A. 561 (1926). Despite this valid legal existence, the majority and the trial court cast the district as an entity subordinate to the town in the attainment of one of the objects of the district's incorporation, i.e., the furnishing of lighting within the district. No one says that the district is invalidly set up; no one could do so as chapter 105 of our General Statutes authorizes its being. Chapter 105, and specifically General Statutes § 7-326 in that chapter, provides that such a district may be established "for any or all of the following purposes" including "[t]o extinguish fires, to light streets . . . ." That statute also provides that "[a]ny district may contract with a town, city, borough or other district for carrying out any of the purposes for which such district was established." It appears that while this district "may" so contract, even with the consolidated town, it does not desire to do so. The majority, like the trial court, without any citation of authority, determines that all the district can do is provide greater service than the municipality. The district, however, must, according to the majority and the trial court, yield

because the town is the "primary provider" of the public services in the consolidated town. This, I submit, involves two thorny problems: (1) it acts effectively to overlook the existence of the district under chapter 105; and (2) it makes the town the "primary provider" in this conflict without explaining how the district, incorporated in 1981, must now become a secondary "nonprovider" of the public services that it was legally authorized to furnish when the district was never consolidated in 1983 with the town pursuant to Home Rule Act (pursuant to General Statutes § 7-194 as the majority points out).

The trial court's position was that the town's "primary responsibility" for providing street lighting in the area now encompassed by the district "was not abdicated to the [district] when [the district] came into existence but rather was retained by the town prior to its consolidation . . . ." It went on to say that "the fact the [district] came into existence before the consolidation . . . is irrelevant as to the issue of which governmental unit has the primary responsibility for providing street lighting to the residents of the [district]." Absent statutory language even suggesting this irrelevancy, this position causes me concern. I appreciate the desirability of harmonizing, if possible, seemingly conflicting statutes as well as achieving consolidation in accordance with prescribed procedures, but it seems to me that the majority's analysis leading to its basic conclusion referred to proves too much. The chapter 105 district in this case was *never* included in the consolidation ordinance of 1983, so how does the town *now* have the legal power to be the "primary provider" of lighting services in the district? I submit that it does not.

It would appear that there is no quarrel that the district is empowered to levy taxes to defray the cost of furnishing services pursuant to powers it is specifically given under chapter 105. See *Williams Bros. Mfg. Co.*

v. *Naubuc Fire District,* 92 Conn. 672, 104 A. 245 (1918). Since chapter 105 and its provisions have been in our statutes for many years, the legislature must be presumed to have been aware of its provisions in legislating on related matters such as the Home Rule Act. The legislature is presumed to act in view of existing relevant statutes to create one consistent body of law. *Rustici* v. *Stonington,* 174 Conn. 10, 13, 381 A.2d 532 (1977). Moreover, various provisions of chapter 105 have been amended recently, including the procedure for the termination of such a district. See General Statutes § 7-329.

I cannot accept the *ratio decidendi* of the majority as to how the town never abdicated its primary responsibility concerning lighting, despite the concededly valid existence of the district since 1981, even before the 1983 consolidation ordinance, in which the majority concedes that the district was not included. This leaves the power to tax for lighting in the district, in my view, with the district. Any doubt as to a municipality's power to tax should be resolved against the existence of the power and in favor of the taxpayer. See *Levin-Townsend Computer Corporation* v. *Hartford,* 166 Conn. 405, 409, 349 A.2d 853 (1974); *Low Stamford Corporation* v. *Stamford,* 164 Conn. 178, 182, 319 A.2d 369 (1972); 14 E. McQuillin, Municipal Corporations (3d Ed. Rev.) § 38.07. I appreciate the allusion to "balkanization" of local government in the majority opinion. I do not agree, however, that it is really a factor in this case, given the time sequence of the creation of the district and the consolidation ordinance. In the latter instance, the majority concedes that the district was not joined under the Home Rule Act as it could have been. On the other hand, we have said that " '[i]f courts can by any fair interpretation find a reasonable field of operation for both statutes without destroying or

perverting their evident meaning and intent, it is the duty of the courts to do so, thus reconciling them and according to them concurrent effect.' " *State* v. *Carbone,* 172 Conn. 242, 256, 374 A.2d 215, cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977); see 1 J. Sutherland, Statutory Construction (3d Ed.) § 2014. The majority, in effect, concludes in reconciling the relevant statutes, including the consolidation ordinance, that the district has no power to pay for furnishing lighting services although it legally was given the express power to furnish that service and collect taxes to pay for it. Courts cannot defeat an express legislative intent to accomplish a reconciliation between perceived repugnancies. See *Sloane* v. *Waterbury,* 150 Conn. 24, 29, 183 A.2d 839 (1962). This is happening in this case.

I respectfully dissent.